IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Christopher Rogers, | ) | C/A No. 0:12-2210-MGL-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Carolyn W. Colvin, Acting Commissioner | ) | |
| of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This social security matter is before the court for a Report and Recommendation pursuant to Local Civil Rule 83.VII.02 DSC et seq.  The plaintiff, Christopher Rogers ("Rogers"), brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) to obtain judicial review of a final decision of the defendant, Acting Commissioner of Social Security ("Commissioner"), denying his claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  Having carefully considered the parties' submissions and the applicable law, the court concludes that the Commissioner's decision should be affirmed.

## ADMINISTRATIVE PROCEEDINGS

In March 2008, Rogers applied for DIB and SSI, alleging disability beginning April 27, 2005. Rogers's applications were denied initially and upon reconsideration, and he requested a hearing before an administrative law judge ("ALJ").  A hearing was held on December 3, 2009, at which Rogers, who was represented by Paul T. McChesney, and a vocational expert appeared and testified. The ALJ held a supplemental hearing on July 22, 2010, again attended by Rogers, his counsel, and

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin is substituted for Michael J. Astrue as the named defendant because she became the Acting Commissioner of Social Security on February 14, 2013.



a vocational expert. The ALJ issued a decision on August 26, 2010, denying benefits and concluding that Rogers was not disabled. (Tr. 9-28.)

Rogers was born in Spartanburg County, South Carolina, and was twenty-four years old at the time of his alleged disability onset date. (See Tr. 675, 680.) He has a high school education and additional schooling at a technical college. (Tr. 950.) He has past relevant work experience as an electrician's helper. (Tr. 27.) Rogers alleged disability since April 17, 2005, due to traumatic brain injury, poor stamina, chondromalacia patella secondary, and body functioning. (Tr. 303.)

The ALJ found as follows:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2010.

2.    The claimant has not engaged in substantial gainful activity since April 17, 2005, the alleged onset date (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.*).
                        *    *    *
3.    The claimant has the following severe impairments:  cognitive disorder, not otherwise specified, secondary to traumatic brain injury; borderline intellectual functioning; adjustment disorder; depression; mild degenerative joint disease, left knee; and chondromalacia patella, left knee (20 CFR 404.1520(c) and 416.920(c)).
                        *    *    *
4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
                        *    *    *
5.    . . . [T]he claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1576(c) and 416.967(c).  Specifically, I find the claimant is able to lift or carry up to 50 pounds occasionally and 25 pounds frequently.  I also find he can stand, walk or sit for six hours each out of an eight-hour workday.  Further, I find he can frequently (rather than constantly) climb ramps or stairs, balance, stoop, kneel, crouch, and crawl.  However, I find he can never climb ropes, ladders, or scaffolds and he must avoid concentrated exposure to hazards.  I also find he is limited to work involving one- to two-step tasks and his work must be low stress, i.e., non-production quota work.  Moreover, I find he can have only occasional interaction with co-workers and no public contact.



* * *

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

* * *

7.      The claimant was born on September 21, 1980 and was 24 years old, which is defined as a younger individual age 18–49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from April 17, 2005, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-28.)  The Appeals Council denied Rogers's request for review on June 5, 2012, making the decision of the ALJ the final action of the Commissioner.  (Tr. 1-3.)  This action followed.

### SOCIAL SECURITY DISABILITY GENERALLY

Under 42 U.S.C. § 423(d)(1)(A), (d)(5) and § 1382c(a)(3)(H)(I), as well as pursuant to the regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R.

§§ 404.1505(a), 416.905(a); <u>see also</u> <u>Blalock v. Richardson</u>, 483 F.2d 773 (4th Cir. 1972).  The regulations require the ALJ to consider, in sequence:

(1)    whether the claimant is engaged in substantial gainful activity;

(2)    whether the claimant has a "severe" impairment;

(3)    whether the claimant has an impairment that meets or equals the requirements of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"), and is thus presumptively disabled;

(4)    whether the claimant can perform her past relevant work; and

(5)    whether the claimant's impairments prevent her from doing any other kind of work.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[2]   If the ALJ can make a determination that a claimant is or is not disabled at any point in this process, review does not proceed to the next step.  <u>Id.</u>

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments.  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience, and impairments, to perform alternative jobs that exist in the national economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B); <u>see also</u> <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th Cir. 1983); <u>Hall v. Harris</u>, 658 F.2d 260, 264-65 (4th Cir. 1981); <u>Wilson v. Califano</u>, 617 F.2d 1050, 1053 (4th Cir. 1980).  The Commissioner may carry this burden by obtaining testimony from a vocational expert.  <u>Grant v. Schweiker</u>, 699 F.2d 189, 192 (4th Cir. 1983).

---

[2] The court observes that effective August 24, 2012, ALJs may engage in an expedited process which permits the ALJs to bypass the fourth step of the sequential process under certain circumstances.  20 C.F.R. §§ 404.1520(h), 416.920(h).



## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), the court may review the Commissioner's denial of benefits. However, this review is limited to considering whether the Commissioner's findings "are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); see also 42 U.S.C. § 405(g); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Thus, the court may review only whether the Commissioner's decision is supported by substantial evidence and whether the correct law was applied. See Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig, 76 F.3d at 589. In reviewing the evidence, the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Id. Accordingly, even if the court disagrees with the Commissioner's decision, the court must uphold it if it is supported by substantial evidence. Blalock, 483 F.2d at 775.

## ISSUES

Rogers raises the following issues for this judicial review:

I.    Did the Defendant commit reversible error in his evaluations of the opinion evidence?

II.   Did the Defendant commit reversible error by failing to provide a reasoned assessment of all of the relevant evidence in assessing Rogers's residual functional capacity?

(Pl.'s Br., ECF No. 17.)  Rogers requests a reversal of his case with an award of benefits or, in the alternative, a remand of his claim to the Commissioner.

## DISCUSSION

### A.    Medical Opinions

There are many opinions in the record, and Rogers argues that the ALJ failed to properly assess several of them. Regardless of the source, the Commissioner will evaluate every medical opinion received. 20 C.F.R. §§ 404.1527(c), 416.927(c). In evaluating medical opinions, generally more weight is given to the opinions of an examining source than a non-examining one. Id. Additionally, more weight is generally given to opinions of treating sources than non-treating sources, such as consultative examiners. Id.

Typically, the Social Security Administration accords greater weight to the opinion of treating medical sources because treating physicians are best able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, "the rule does not require that the testimony be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). Rather, a treating physician's opinion is evaluated and weighed "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). Any other factors that may support or contradict the opinion should also be considered.[3] 20 C.F.R. §§ 404.1527(c)(6), 416.927(c)(6). In the face of "persuasive contrary evidence," the ALJ has the discretion to accord less than controlling weight to such an opinion.

---

[3] The Social Security regulations provide that *all medical opinions*, which include opinions of examining doctors and of nonexamining state agency doctors, will be evaluated considering these same factors. 20 C.F.R. §§ 404.1527(c), (e), 416.927(c), (e).



Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Further, "'if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.'" Id. (quoting Craig, 76 F.3d at 590).

### 1.    Dr. Scott Coley, III

Dr. Coley offered an opinion dated September 23, 2009. (See Tr. 975.) As summarized by the ALJ,

> He submitted a statement opining that the claimant should be limited to sedentary work because of his knee condition alone. . . . Dr. Coley further opined that, due to mental impairments, the claimant would not be able to concentrate on what he was doing long enough to maintain production on even simple one- and two-step tasks, would not be able to remember simple instructions consistently, and would not be able to interact appropriately with supervisors and co-workers.

(Tr. 26.) Additionally, Dr. Coley stated, "I do not feel it would [be] possible for Mr. Rogers to perform any kind of work." (Tr. 975.) The ALJ gave this opinion "little weight." (Tr. 26.)

The ALJ explained that he discounted Dr. Coley's opinion because it was "not supported by the objective medical evidence of record." (Tr. 26.) The ALJ noted that Rogers had stated that he was capable of lifting fifty pounds, walks two miles per day, and "has performed roofing work."[4]

(Id.) Further, "recent x-rays" of Rogers's knee "showed no acute abnormality." (Id.) As to his opinion on Rogers's mental impairments, the ALJ noted that Dr. Coley was a "family doctor, not a neurologist or a mental health professional," and, thus, he had opined on an area outside of his expertise. (Id.) Also, the ALJ questioned whether Dr. Coley "was familiar with the definition of 'disability' contained in the Social Security Act and regulations." (Id.) Finally, the ALJ

---

[4] The court agrees with Rogers that the ALJ appears to have mischaracterized Dr. Coley's notation stating that Rogers "has a little job with a friend of his who owns a roofing company," especially considering that there are no further details regarding this job in the record. (Tr. 718.) The court does not consider this reason as supporting the ALJ's assessment of Dr. Coley's opinion.



acknowledged that Rogers had a "treating relationship" with Coley, but noted that actual treatment visits were "relatively infrequent."  (Id.)

Rogers argues that Dr. Coley's opinion references the MRI of his knee, but the pages in the record that he cites do not mention an MRI, (see Tr. 974, 977); nor is one referenced in Dr. Coley's medical records.  Further, contrary to Rogers's argument, Dr. Coley's observation that Rogers "does have a bit of a limp" (Tr. 974) does not render the ALJ's decision to give little weight to the doctor's opinion that Rogers is limited to sedentary work unsupported.

Similarly, as to Rogers's mental impairment, he points to Dr. Coley's observation that Rogers "loses his train of thought and forgets what he is saying."  (Tr. 974.)  However, the court cannot say that the ALJ erred by not inferring from this comment that Rogers "would not be able to concentrate on what he was doing long enough to maintain production on even simple one and two step tasks," would not be able to remember simple instructions consistently, and would not be able to interact appropriately with supervisors and co-workers, especially considering Dr. Coley's lack of specialization in the field of mental impairments.  (Tr. 975.)  Although Dr. Coley does refer to Rogers's brain CT, this "objective medical evidence" is dated the day after Rogers was hospitalized with his brain injury, and is undermined by more recent test results.  (Compare Tr. 623 with Tr. 1058.)

Rogers objects to the ALJ's reliance on his lack of expertise, but whether the physician is a specialist is one of the criteria to be considered in determining the weight to be give a physician's opinion.  Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527); see also Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000) (noting that "opinions outside [a] physician's field of expertise carry little weight"); Stephens v. Heckler, 766 F.2d 284, 289 (7th Cir. 1985) ("[A]



physician who specializes . . . may contribute more knowledge to the administrative process after a one-hour examination than the general practitioner . . . contributes after years on the case. . . . The consulting specialist can tell how a patient fits in a spectrum of similar ailments, something the non-specialist may not be able to do."). Rogers adds that Dr. Coley "received copies of records from such specialists and diagnostic tests" (Pl.'s Br. at 10, ECF No. 17 at 14), but these records are not included with his notes, and he references, in addition to the April 2005 brain CT, only "testing done by Ron Thompson, Ph.D., on 10/6/05" (Tr. 974). Moreover, the ALJ gave "some weight" to the opinions of Dr. Thompson, finding that they were "mostly consistent" with the ALJ's assessment of residual functional capacity ("RFC"). (Tr. 24-25.)

Rogers points out that Dr. Coley has treated him "over an extensive period of time, beginning 'in the early 2000s.'" (Pl.'s Br. at 10, ECF No. 17 at 14) (quoting Tr. 974). Yet there is no evidence of such an extensive period, because the first medical record in evidence is dated March 7, 2005—just one month prior to Rogers's alleged onset of disability. (See Tr. 431.) Moreover, from this March 7, 2005 visit through his opinion in September 2009, Dr. Coley saw Rogers on ten occasions, or roughly twice per year.

Rogers argues that his statements about walking two miles per day and that he could lift up to fifty pounds are not adequate to discount Dr. Coley's opinion, but the court finds that, together with the ALJ's other reasoning, there is substantial evidence to support the ALJ's finding. See 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion."); see also Williams v. Astrue, 416 F. App'x 861, 863 (11th Cir. 2011) (finding "substantial evidence" to support the ALJ's decision to "give little weight" to a physician's opinion where the doctor "did not perform clinical tests, her

opinion was unsupported by other medical findings in the record, her opinion was contradicted by another doctor's psychiatric evaluation that was based upon clinical tests, and her opinion appeared to be inconsistent with [the claimant's] own statements."). Counsel argues in his Reply Brief that Rogers overestimates his abilities and lacks insight into his limitations. (ECF No. 20 at 4.) But there is no indication in the record that Rogers lacked insight into his *physical* abilities and, more than once, he proffered statements about what he *was* doing, not what he wanted or hoped or planned to do. (See, e.g., Tr. 682 ("able to walk okay and can do elliptical trainer activity"); 929 (indicating that he can walk over a mile); 1018 (walks regularly); 1023 (lists his hobby as "walking"); 1049 (walks daily)).

Next, Rogers turns to his knee impairment. He argues that, although his knee x-ray showed no "acute" finding, it was not "normal" (Pl.'s Br. at 11, ECF No. 17 at 15), and the ALJ agreed. The ALJ found Rogers's mild degenerative joint disease, left knee, and chondromalacia patella, left knee, both to be "severe." (Tr. 14.) The ALJ accounted for these impairments by limiting Rogers to "medium work with further postural and environmental limitations." (Tr. 23.) He referred to the opinion of Dr. Phillip Esce, who treated Rogers after his April 2005 accident, that Rogers had normal gait, dexterity and coordination, normal strength in his extremities, and no range of motion deficits. (Id.) Further, Rogers had told an examiner, Dr. Luther Diehl, that he walked two miles per day, and he reported that he could lift fifty pounds. Additionally, Rogers told Dr. John Taylor, another examiner, that he was playing softball in a church league and that he used an elliptical trainer. Although there is evidence that Rogers continued to complain of knee pain, his own statements of his activities of daily living contradict Dr. Coley's opinion. See Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (affirming the ALJ's rejection of claimant's treating physician's opinion, in part,



because it appeared to be inconsistent with the claimant's level of activities).  Moreover, even where a plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supports the decision.  Blalock, 483 F.2d 773.

Rogers contends that the ALJ erred in seemingly discounting Dr. Coley's opinion because it appeared to be drafted by his attorney.  (See Tr. 26.)  Yet "an opinion may be reasonably rejected by the ALJ when the form is drafted by the plaintiff's attorney and merely requires a check mark or an affirmative response by the doctor"; however, "the form of the opinion is just one factor 'along with all the other facts' in the determination of whether the treating physician is entitled to controlling weight."  Fischer v. Barnhart, 256 F. Supp. 2d 901, 906-07 (E.D. Wis. 2002) (quoting Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001)).  If indeed the ALJ relied on this factor in discounting Dr. Coley's opinion—and it is not clear that he did so—he did not commit reversible error in so doing, as it is only one of several on which he relied.

In response to the ALJ's musing that it is not clear that Dr. Coley was familiar with the Commissioner's definition of "disability," Rogers provides support from the doctor's opinion. However, whether an individual is "disabled" under the Act is an administrative finding that is dispositive of a case, and the final responsibility for deciding this issue is reserved to the Commissioner. SSR 96-5p, 1996 WL 374183. A physician's opinion on this issue is not a "medical opinion," and the ALJ is not to "give any special significance to the source of" such opinion. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Thus, the decision of this issue is grounded in the opinions of state agency consultants, who are "highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation," and whose opinions the

ALJ *must* consider. Id. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i). As there is no evidence that Dr. Coley held such expertise, the ALJ would not have erred in relying on this deficit. See Stephens v. Heckler, 766 F.2d 284, 289 (7th Cir. 1985) ("The regular physician . . . may lack an appreciation of how one case compares with other related cases.").

As to the ALJ's comment that Rogers's visits with Dr. Coley were "relatively infrequent," the ALJ could justifiably rely on this factor. See 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(d)(2)(i) ("[T]he more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."); see also Casey v. Astrue, 503 F.3d 687, 693 (8th Cir. 2007) (affirming ALJ's weighting of treating physician's opinion that relied, in part, on "the infrequent nature of the treatment visits"). Rogers objects that he was instead going to the Veterans Administration ("VA") for treatment,[5] but this explanation only further supports the ALJ's decision to lightly weigh Dr. Coley's opinion.

### 2.     Robbie D. Buechler, M.D., Ph.D.

The ALJ summarizes Dr. Buechler's June 29, 2010 letter to opine that Rogers's "memory and emotional problems were likely the result of atrophy in the temporal and frontal lobes of his brain" and concludes that "any change" in Rogers's "situation or new stress could cause him to behave in an erratic and unpredictable manner." (Tr. 26) (citing Tr. 1082-83). The ALJ gave "little weight" to this doctor's opinion because: (I) "no such assessment ever appeared in Dr. Buechler's own office treatment records"; (ii) the statement was drafted by Rogers's attorney; and (iii) Rogers only saw Dr. Buechler twice. (Tr. 26.)

---

[5] The VA medical records show that Rogers did not have regular visits there until March 2008, almost three years after his accident and about the same time he applied for disability.



Rogers contends that Dr. Buechler's treatment notes state that Rogers has "'right basal ganglia and temporal lobe atrophy status post subarachnoid hemorrhage and left frontal lobe damage'" (Pl.'s Br. at 16, ECF No. 17 at 20), but a diagnosis is insufficient to establish disability as "[t]here must be a showing of related functional loss." Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986). He further refers to the doctor's notation that Rogers "has difficulty with concentration, thinking and behavioral issues" (Tr. 1033), but, unlike those evaluators who tested Rogers, there is no indication that Dr. Buechler made this observation himself rather than simply recording Rogers's own statement. See Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) (quoting Craig v. Chater, 76 F.3d 585, 590 (1996)) (holding that a physician's opinion, if "'not supported by clinical evidence . . . should be accorded significantly less weight.'").

Rogers complains that the ALJ gave more weight to physicians who examined him only once or not at all, but as explained above, state agency consultants are highly qualified and also experts in Social Security disability evaluation. The opinions of consultative examiners, and of state agency consultants, are subject to the same evaluation as of other medical sources. 20 C.F.R. §§ 404.1527(e), 416.927(e). This court is "not at liberty to 'reweigh conflicting evidence . . . or substitute [its] judgment for that of the [ALJ].'" Hancock v. Astrue, 667 F.3d 470, 476 (4th Cir. 2012) (third alteration in original) (quoting Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). Rogers has failed to establish that the ALJ committed reversible error in weighing Dr. Buechler's opinion.

### 3.    Luther A. Diehl, Ph.D.

The ALJ gave "little weight" to the opinions of Dr. Diehl. On June 23, 2009, Dr. Diehl opined that Rogers met Listing 12.02 (Organic Mental Disorders) and Listing 12.04 (Affective

Disorders) in that Rogers had "marked difficulties" in two of the "B criteria" for both Listings.[6]  (See Tr. 26) (citing Tr. 946-57).  By checklist dated July 15, 2009, Dr. Diehl "indicated that [Rogers] would not be able to function satisfactorily (for eight hours a day) when relating to co-workers, dealing with the public, using judgment, interacting with supervisors, dealing with ordinary work stresses, functioning independently, and maintaining attention/concentration."  (Tr. 26) (citing Tr. 964-65).  The ALJ explained that Dr. Diehl's opinions were "not consistent with the objective medical evidence of record."  (Tr. 26.)

In his assessment of Rogers's mental impairments, the ALJ found that he had only "mild" restriction in his activities of daily living.  (Tr. 19.)  The ALJ explained that Rogers reported no problems with caring for his own personal needs and that he was able to drive.   In a neuropsychological evaluation in July 2009, Rogers told Dr. J.P. Ginsberg that he was playing in a church softball league.  Rogers had told Dr. Diehl that he walked two miles each day.  On his state disability "Function Report," completed in March 2008, Rogers stated that he downloads music and draws, and needs no reminders to take care of personal needs or to take medicine.  He added that he does not prepare meals because of knee pain.  Rogers told a state disability worker that he watches television and goes outside to sit on the porch.

With regard to Rogers's ability to maintain concentration, persistence or pace, the ALJ found that he had "moderate" difficulties.  (Tr. 19.)  The ALJ explained that Rogers "testified to many activities requiring some degree of concentration, persistence and pace," including attending Sunday

---

[6] "We measure severity according to the functional limitations imposed by your medically determinable mental impairment(s).  We assess functional limitations using the four criteria in paragraph B of the listings:  Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation."  20 C.F.R. pt. 404, subpt. P, app. 1, 12.00.C.



School classes, and playing games on and downloading music from the computer.  (Id.)  Rogers stated that he "reads some" but needs his parents to explain the meaning to him, and can only sustain interest in an activity for fifteen minutes.  (Id.)  The ALJ did find that Rogers had "marked" difficulties with social functioning.

The ALJ further based his determination that Dr. Diehl's opinions were entitled to little weight on "the opinions of the State agency medical and psychological experts, Dr. Taylor, or Dr. Ginsburg [sic]," opinions which he assigned "great weight" as based on the objective medical evidence, and which were inconsistent with Dr. Diehl's opinions.  (Tr. 25.)  Finally, the ALJ noted that Rogers consulted with Dr. Diehl, "not in an attempt to seek treatment for symptoms, but rather, through attorney referral and in connection with an effort to generate evidence for the current appeal."[7]  (Id.)  The ALJ presumed that Dr. Diehl had been "paid for the report," and added that, "[a]lthough such evidence is certainly legitimate and deserves due consideration, the context in which it was produced cannot be entirely ignored."  (Id.)

Rogers counters that Dr. Diehl's opinion is consistent with the "objective medical evidence of record," that is Dr. Diehl's own testing results.  (Pl.'s Br. at 23, ECF No. 17 at 27.)  But the ALJ did not contrast Dr. Diehl's opinion with the doctor's test results, but rather, with the evidence that the ALJ relied upon in making his severity findings.  Rogers adds that Dr. Diehl's opinion is consistent with that of Rogers's other treating physicians, but the ALJ did not rely on these other opinions in finding that Rogers was not disabled.

---

[7] Actually, Rogers's first consultation with Dr. Diehl, in June 2006, was for an "[a]ssessment of current psychological status with particular attention to possible difficulties which might have affected his behavior in situations leading to current legal charges."  (Tr. 675.)



Rogers argues that the ALJ's failure to weigh Dr. Diehl's 2006 evaluation is an error of law because the earlier report demonstrates the doctor's consistency and that "his opinions were based on more than an only one-time examination." (Id.) But the ALJ did not use a contrast between the two reports, or the infrequency and three years in between, in order to discount Dr. Diehl's opinion. Moreover, there was no need for the ALJ to evaluate Dr. Diehl's 2006 report.

> The regulations provide that
>
> [m]edical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Dr. Diehl's 2006 report contained diagnoses of Rogers's impairments (major depressive disorder, single episode, severe without psychotic features; cognitive disorder not otherwise specified), but it did not discuss severity, prognoses, or what he could still do despite his impairments. In fact, Dr. Diehl's testing revealed that Rogers's working memory appeared to be within normal limits, but with relative weakness in utilization of reasoning skills and problem-solving abilities. (Tr. 684-86.) Further, the state psychological consultants considered Dr. Diehl's 2006 assessment. (See Tr. 749, 829.) As Dr. Diehl did not offer a "medical opinion" in 2006, other than his diagnoses (which the ALJ adopted), the court cannot say that the ALJ committed legal error in not weighing the 2006 report.

Rogers also objects to the ALJ using his B criteria findings to discount those of Dr. Diehl because the ALJ ignored Dr. Diehl's "GAF" findings.[8]  Rogers notes that there are three GAF scores in the record in the forty-one to fifty range[9]; Dr. Diehl accounts for two of those, finding a GAF of forty-five on each occasion that he evaluated Rogers.

A GAF score, however, may simply reflect the severity of symptoms, or the impairment in functioning, at the time of the evaluation.  DSM-IV at 32-33; see also Parker v. Astrue, 664 F. Supp. 2d 544, 557 (D.S.C. 2009) (observing that the plaintiff's "GAF score is only a snapshot in time, and not indicative of Plaintiff's long term level of functioning").  Further, the GAF score, standing alone, is of little significance to the factfinder, as there is no indication of whether it applies to symptom severity or level of functioning or impairment in reality testing or communication or major impairment in several areas and, if in several areas, which areas, and if these areas impact basic work activities.  See 20 C.F.R. §§ 404.1521, 416.921; see also "Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury," 65 Fed. Reg. 50746-01, 50764-765 (Aug. 21, 2000) (explaining that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings").  Thus, a GAF score of 45 may indicate problems not necessarily related to Rogers's ability to hold a job and, standing alone, without any further narrative explanation, does

---

[8] The American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, fourth edition ("DSM-IV"), contains a numeric scale (0 through 100) used to rate the severity of psychological symptoms and/or social, occupational, or school functioning.  However, the court observes that the fifth edition of the DSM, published in 2013, has discontinued use of the GAF.  American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, 16 (5th ed. 2013) ("DSM-V").

[9] According to the DSM-IV, a GAF score between 41 and 50 may reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id. at 34.

not support an impairment seriously interfering with his ability to work, the ultimate question in a disability case. See Kornecky v. Comm'r of Soc. Sec., 167 F. App'x 496, 511 (6th Cir. 2006) (explaining that a GAF score "may have little or no bearing on the subject's social and occupational functioning"). Dr. Diehl's GAF ratings are merely two pieces of information in hundreds of pages of medical records and among dozens of scores, most of which come from objective tests. Because, for Social Security disability purposes, a GAF rating is simply another observation which is presumably subsumed into the medical source's final assessment, the ALJ did not err in failing to specifically address the GAF scores.

Rogers contends that the ALJ is "unreasonable" in relying on the opinions of the State agency medical and psychological experts, Dr. Taylor, and Dr. Ginsberg. (Pl.'s Br. at 25, ECF No. 17 at 29.) He argues that Dr. Diehl's opinion is based on objective medical evidence, but both Drs. Taylor and Ginsberg conducted a battery of tests on Rogers, and they are both neuropsychologists.[10]  See 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5) (listing "specialization" as a factor to weigh in evaluating medical opinions).  Rogers adds that Dr. Diehl's opinion is consistent with those of his treating physicians and, thus, should be assigned more weight.  But the consistency valued by the regulations is "with the record as a whole," 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3), and not solely with other opinions.  The ALJ found that the record as a whole supported his B criteria findings, and not those of Dr. Diehl.

---

[10] Neuropsychology is a "specialty of psychology concerned with the study of the relationships between the brain and behavior, including the use of psychological tests and assessment techniques to diagnose specific cognitive and behavioral deficits and to prescribe rehabilitation strategies for their remediation."  Stedman's Medical Dictionary 1213 (27th ed. 2000).



Rogers further objects that the ALJ erred in giving greater weight to opinions which pre-dated Dr. Diehl's, which "were made without the benefit of the more longitudinal view of Rogers's persistent limitations." (Pl.'s Br. at 26, ECF No. 17 at 29.) The regulations provide that "the longer a treating source has treated [the claimant] and the more times [the claimant has] been seen by a treating source, the more weight [will be given] to the source's medical opinion," because the treating source would have seen the claimant "a number of times and long enough to have obtained a longitudinal picture" of the claimant's impairment. 20 C.F.R. §§ 404.1527(c)(2)(I), 416.927(c)(2)(I). However, Rogers points to no information that Dr. Diehl relied on that was not available to the other medical sources who issued opinions. Further, although Dr. Diehl's evaluations occurred during a three-year span, the doctor saw Rogers only twice during that period, not "a number of times."

Rogers additionally argues that the ALJ erred in discounting Dr. Diehl's opinion because he consulted the doctor at the request of his attorney and he paid Dr. Diehl for the evaluation. The ALJ did not rely solely on the source of the referral or the payment for the consultation in discounting Dr. Diehl's opinion, and he did not commit reversible error in having these factors play a part in his decision. See Oeffner v. Astrue, No. 10cv1851-BEN(MDD), 2011 WL 3664385, at *6-7 (S.D. Cal. July 6, 2011) (holding that where the ALJ provided several valid bases for calling the doctor's opinion into question, the ALJ properly considered the source of the doctor's fee and the fact that the doctor was selected by plaintiff's counsel as that was a permissible credibility determination within the ALJ's discretion and a valid reason for rejecting the doctor's opinion).

Rogers notes that the ALJ relied on the opinions of state agency experts and consultative examiners who are paid by the government. However, "[t]he legislative history of the disability



program, which was added by the Social Security amendments of 1956, 70 Stat. 818, shows that the Social Security Administration was designed to function as an impartial adjudicator of the claims and not as an advocate." <u>Salling v. Bowen</u>, 641 F. Supp. 1046, 1071 (W.D. Va. 1986); <u>cf. Richardson v. Perales</u>, 402 U.S. 389, 403-04 (1971) (concluding that based on several factors which assured the reliability and probative value of written reports by nontestifying licensed physicians who examined the claimant, the reports may be admitted as evidence in a disability hearing and may constitute substantial evidence).

### 4.    Eduardo F. Irizarry, M.D., and Deborah Reyes, Ph.D.

Dr. Irizarry is a VA physician that appears to specialize in the treatment of traumatic brain injury and Dr. Reyes is a psychologist on the VA's traumatic brain injury team. (<u>See</u>, <u>e.g.</u>, Tr. 1097.) The ALJ explained that these doctors jointly completed[11] a checklist assessment which indicated that Rogers was limited to functioning satisfactorily, in the same areas as indicated by Dr. Diehl, for less than half of the typical eight-hour workday. (Tr. 25.) In a separate questionnaire, these doctors opined that Rogers's "behavioral problems would greatly interfere with working eight hours a day, five days a week, and . . . that these problems were the result of his brain injury." (<u>Id.</u>) (citing Tr. 1141-43).

The ALJ gave these opinions "little weight," as "the evidence they relied on does not support the degree of limitation they indicate the claimant has." (Tr. 25.) On the checklist, the doctors answered that they relied on the neuropsychological evaluation performed by Dr. Ginsberg but, in the ALJ's assessment, "Dr. Ginsberg simply acknowledged the claimant had some behavioral

---

[11] There is no indication that both doctors completed the checklist, and Dr. Reyes is the only signatory thereto. (<u>See</u> Tr. 1142.)



problems. He never opined that the claimant would be unable to function satisfactorily in these areas." (Id.) Rogers argues that the doctors "do not indicate that they adopted Dr. Ginsberg's opinions. Rather, they made specific findings based on the information gathered by Dr. Ginsberg's neuropsychological testing." (Pl.'s Br. at 18, ECF No. 17 at 22.)

It is not this court's role to speculate on what reasoning underlies the opinions of record, but rather, like the ALJ, to look at the evidence before it. Under the percentages chosen by the doctors in a subsection "A," the checklist asks in a subsection "B": "Describe any limitations and include the medical/clinical findings that support this assessment." (Tr. 1141.) The doctors responded, "[S]ee neuropsychological evaluation by Dr. Ginsberg (7-4-09)[.]" They do not otherwise describe any limitations or include medical/clinical findings to support their assessment; rather, they expressly rely on any limitations and medical/clinical findings found in Dr. Ginsberg's evaluation.

Rogers was referred to J. P. Ginsberg, Ph.D., by the VA for a consultative neuropsychological evaluation. (See Tr. 959.) He lists his administered materials as "mental status exam, symptom checklist, structured interview of malingered symptomatology, Green's medical Symptom Validity Test, Mini Mental Status Exam, repeatable battery for the assessment of neuropsychological status, mental control." (Tr. 960.) Rogers told the doctor that he had no problem driving; he was not seeing a psychiatrist; and he was taking psychiatric medications but needed help from his mother to stay on them. (Tr. 960-61.)

The mental status exam showed that Rogers was not in emotional distress. (Tr. 961.) He did not sleep during the day. He described his mood as angry and admitted to anger problems. Depression screening revealed "only some sadness and feelings of guilt." (Id.) He was in a church

softball league and enjoyed playing. He liked playing on his computer. Rogers said that he had been trying to work, but was not employed.

The behavior testing showed hostility with paranoid ideation. (Tr. 962.) "Validity testing of his symptoms was positive suggesting the presence of over reporting of neurological and amnestic complaints." (Id.) Also, Rogers's "perception of his loss of memory leads him to believe that he has a far greater significant memory problem and neurological impairment than he objectively does have." (Id.) Neuropsychological testing showed average scores for attention and delayed memory, although his immediate memory was depressed. Mental control was in the average range.

Dr. Ginsberg's diagnoses were atypical mania and post-traumatic brain syndrome. His testing revealed little cognitive impairment, and only minor problems with immediate recall. Dr. Ginsberg found "[p]roblem behaviors" to be in evidence and "possibl[y] exacerbated from pre-injury levels." (Id.) At the time (July 2009), Rogers still had "difficulty with anger and ha[d] not found the effective treatment as far as counseling." (Id.)

In conclusion, Dr. Ginsberg stated:

I believe that [Rogers's] behavior problems and tendency toward manic are a possible, if not likely direct effect of the serious brain injury that he suffered. He has made a remarkable recovery as far as his thinking and memory ability goes, but does have some significant behavioral adjustment problems, in particular, with anger and self control.

(Id.) He felt that Rogers had "some dyscontrol or disinhibition that ha[d] been exacerbated from pre-injury level," and that Rogers was "experiencing behavioral residuals." (Tr. 963.) Dr. Ginsberg additionally opined that Rogers would "need assistance because of some problems at times with impaired judgment and loss of control due to manic tendencies." (Id.) The ALJ gave "significant weight" to Dr. Ginsberg's opinion as "well supported by the objective medical evidence, including



tests he administered"; "consistent with the opinions of the State Agency experts and Dr. Taylor"; and consistent with Rogers's hearing testimony.  (Tr. 24.)

Therefore, although Drs. Reyes and Irizarry could base their conclusions on Dr. Ginsberg's evaluation, "it is the province of the [Commissioner], and not the courts, to . . . resolve ambiguities in the evidence" and Rogers has failed to demonstrate that the ALJ's decision is unsupported by substantial evidence.  Mickles v. Shalala, 29 F.3d 918, 929 (4th Cir. 1994); see also Craig, 76 F.3d at 589 (discussing substantial evidence).  Although Rogers also argues that the ALJ erred in failing to note the doctors' reasoning that Rogers "had difficulty appropriately interacting during treatment sessions," and their referral of him for treatment (Tr. 1142), there remains substantial evidence to support the ALJ's reasoning.

**5.     Dr. Ginsberg and John M. Taylor, Ph.D.**

Dr. Taylor is a neuropsychologist who evaluated Rogers in October 2007 on behalf of the state Vocational Rehabilitation Department ("VRD").  (See Tr. 672; see also Tr. 815.)  The ALJ gave "great weight" to Dr. Taylor's determination that Rogers's functioning "was consistent with only very mild cognitive impairment," and that his "cognitive functioning would not pose any significant limitations for him."  (Tr. 24.)  When VRD contacted Dr. Taylor after Rogers exhibited behavioral problems, the doctor "maintained there was no indication from testing that these [behaviors] were triggered by his brain injury."  (Id.) (citing Tr. 814).

Rogers contends that the ALJ erred in ignoring Dr. Ginsberg's statements that Rogers's "behavior problems and tendency toward manic" stem from his brain injury, and that Rogers has significant behavioral adjustment problems, especially with anger and self-control.  (Tr. 962.)  But the ALJ specifically referred to the doctor's notation that Rogers "does have some significant

behavioral adjustment problems, particularly with anger and self-control." (Tr. 24.) Moreover, because "[t]he record shows that the claimant has significant behavioral adjustment problems, particularly with anger and self-control," the ALJ limited Rogers to only occasional contact with co-workers and no public contact. (Tr. 23.) Dr. Ginsberg's belief that Rogers's behavioral problems were a "likely direct effect" of his brain injury (Tr. 962), is countered by Dr. Taylor's observation that testing did not indicate that conclusion (Tr. 814). Rogers disagrees with the ALJ's decision to favor Dr. Taylor's stance, but in a battle of competing examining specialists, there is no error in the ALJ making that choice. See Hancock v. Astrue, 667 F.3d 470, 476 (4th Cir. 2012) ("The ALJ ha[s] the duty to find facts and consider the import of conflicting evidence.").

Rogers also complains that the ALJ ignored Dr. Taylor's belief that Rogers was "having some adjustment reaction" and the doctor's recommendation that Rogers "be referred for a short course of cognitive behavioral therapy as well as review of his medication management." (Tr. 674.) These statements, however, are not inconsistent with the ALJ's observation that "[t]he record shows that the claimant has significant behavioral adjustment problems," which led the ALJ to make accommodations in his RFC finding. (Tr. 23.) Further, the ALJ noted Rogers's testimony that he was taking medication, and that Rogers "stopped his vocational counseling in September 2009, reporting that he would rather wait for his Social Security determination to be done before returning for additional help." (Tr. 22) (citing Tr. 970); cf. 20 C.F.R. §§ 404.1530(a), 416.930(a) ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work.").

PJG

### 6.    Ron O. Thompson, Ph.D.

Dr. Thompson conducted a consultative examination on behalf of the state disability agency on October 6, 2005 (Tr. 642), and a second one at the request of Rogers's attorney on October 29, 2009 (Tr. 997).[12]  The ALJ gave only "some weight" to the opinion of Dr. Thompson.  (Tr. 24.)  As to the first examination, the ALJ noted the doctor's opinion that Rogers "was able to maintain a fair pace and persistence in very simple, repetitive, work-related tasks, as long as he were not pushed too hard or under a great deal of stress."   (Id.) (citing Tr. 645).   The ALJ noted at the second examination, Dr. Thompson opined that although Rogers "appeared almost the same as in the first evaluation," Dr. Thompson's assessment was now changed to "able to maintain fair pace and persist in simple, repetitive types of work tasks *in a quiet environment with an overly understanding employer if he were left alone*."  (Tr. 25) (emphasis added).  The ALJ found these opinions to be "mostly consistent" with the RFC he had found, but found no evidence of a need for Rogers to have an "overly understanding" employer "so long as he is limited to occasional contact with co-workers and has no public contact."  (Id.)

Dr. Thompson also concluded, however, that Rogers "had marked restrictions with regard to interacting appropriately with co-workers, responding appropriately to changes in a routine work setting,[13] making judgments on simple work-related decision, and carrying out detailed instructions."  (Id.) (citing Tr. 1001-02).  The ALJ decided to give this portion of the opinion "little weight," finding that it contradicted the opinion of Dr. Taylor "who reported that [Rogers's] test

---

[12] The ALJ writes the dates as June 2006 and November 2009.  (Tr. 24.)

[13] Dr. Thompson actually found that Rogers had an "extreme" restriction in responding appropriately to work pressures in a usual work setting.  (Tr. 1002.)  The checklist setting out these restrictions defines "Extreme" as "major limitation in this area.  There is no useful ability to function in this area."  (Tr. 1001.)



results showed no indication that his behavioral issues were triggered by his brain injury." (Tr. 25) (citing Tr. 814).

Relying on other statements in Dr. Taylor's opinions, Rogers argues that "[t]he ALJ cannot ignore the totality of Dr. Taylor's opinions in order to discount the sound opinion of [Dr. Thompson] who evaluated Rogers twice and based his opinions on objective tests." (Pl.'s Br. at 28, ECF No. 17 at 32.) But, as discussed hereinabove, there is no evidence that the ALJ ignored any of Dr. Taylor's opinion, and his views are reflected in the ALJ's RFC decision. Additionally, Dr. Taylor, a neuropsychologist, also subjected Rogers to a battery of tests, over the course of two days. (See Tr. 672-73.) Rogers has demonstrated no error in the ALJ's decision to favor Dr. Taylor's opinion over Dr. Thompson's.

### 7.     James N. Ruffing, Psy.D.

The state disability agency referred Rogers to Dr. Ruffing for a consultative examination. (Tr. 725.) Dr. Ruffing conducted a clinical interview and reviewed Rogers's records, including Dr. Thompson's first report and Dr. Coley's records. (Tr. 725-26.) The ALJ gave "great weight" to Dr. Ruffing's conclusion that Rogers "may struggle to perform anything more than simple tasks and have difficulty understanding, remembering and carrying out more than simple instructions," as consistent with the evidence. (Tr. 24) (citing Tr. 728).

Rogers complains that the ALJ ignored Dr. Ruffing's notation of Rogers's statements, and Dr. Ruffing's observation that Rogers was a "difficult interviewee" as it was "challenging to get a clear sense of his history from his accounting and recall." (Tr. 727.) He is particularly concerned that the ALJ did not address the doctor's conclusion that Rogers "demonstrates emotional instability in the sense of poor impulse control and irritability." (Tr. 728.) However, throughout the decision,

the ALJ's focus remained on Roger's functionality, and on his symptoms only to the extent that they affect his functionality. Cf. Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) (an ailment is pertinent to the disability assessment only to the extent it affects functionality). Further, the ALJ had acknowledged Rogers's behavioral difficulties and took them into account in his RFC finding. Accordingly, Rogers demonstrates no reversible error in the ALJ's evaluation of Dr. Ruffing's opinion.

### 8.    State Agency Opinions

In performing his RFC assessment, the ALJ relied on findings of "State agency medical consultants" Dale Van Slooten, M.D. (10/3/05, Tr. 632-39); Renuka Harper, Ph.D. (10/14/05, Tr. 653-56); Williams Hopkins, M.D. (4/28/08, Tr. 729-36); Debra C. Price, Ph.D. (5/2/08, Tr. 751-54); and Larry Clanton, Ph.D. (10/1/08, Tr. 831-34), giving them "great weight." (Tr. 24.) The ALJ explained that the physical assessments were consistent with his findings and "with the entire objective medical evidence of record and were provided by medical experts familiar with Social Security's laws and regulations." (Id.)

Rogers argues that the ALJ's reasoning is "unreasonable in light of the overwhelming contradictory evidence from [his] treating physicians." (Pl.'s Br. at 32, ECF No. 17 at 36.) However, with regard to each of the disputed opinions, discussed above, Rogers has failed to demonstrate that the ALJ committed reversible error. In a record with a myriad of medical opinions, Rogers appears to desire that the ALJ give great weight to the opinions supporting a disability finding while ignoring or discounting the ones that do not. But "cherry picking," either in favor or against a claimant, is not permitted. See 20 C.F.R. §§ 404.1527(b), 416.927(b) ("In determining whether you are disabled, we will always consider the medical opinions in your case record together

with the rest of the relevant evidence we receive."); <u>id.</u> §§ 404.1545, 416.945 (stating that a claimant's residual functional capacity "based on all of the relevant medical and other evidence"). Here, the ALJ's opinion shows that he carefully considered and weighed all of the medical opinions in the record, giving reasons for his conclusions that are permitted by the applicable regulations and caselaw.  Whether another factfinder could reasonably conclude otherwise is not the standard; here, the ALJ's conclusions are supported by substantial evidence and are free from legal error, and that is all that is required.

**B.    Residual Functional Capacity ("RFC")**

Rogers complains that the ALJ erred in formulating his RFC.  An RFC "is the most [a claimant] can still do despite [his] limitations."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  In assessing RFC, an ALJ should scrutinize "all of the relevant medical and other evidence."  <u>See</u> 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).  SSR 96-8p further requires an ALJ to reference the evidence supporting her conclusions with respect to a claimant's RFC.  <u>See</u> SSR 96-8p, 1996 WL 374184.  The RFC assessment must be based on all of the relevant evidence in the record.[14]  <u>Id.</u>  The ALJ must address both the individual's exertional and nonexertional capacities.  <u>Id.</u> at *5-6.  Further, the assessment must include a narrative discussion describing how the evidence supports the ALJ's conclusion.  <u>Id.</u> at *7.

---

[14] This evidence includes:  medical history, medical signs and laboratory findings, the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (<u>e.g.</u>, frequency of treatment, duration, disruption to routine, side effects of medication), reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment, evidence from attempts to work, need for a structured living environment, and work evaluations, if available. SSR 96-8p, 1996 WL 374184, at *5.



### 1. Rogers's Ability to Deal with Supervisors

Rogers first argues that the ALJ failed to consider evidence that he would have difficulty responding to supervisors.  The ALJ considered Dr. Thompson's opinion that Rogers needed "an overly understanding employer," but found the evidence not to support that restriction "so long as [Rogers] is limited to occasional contact with co-workers and has no public contact."  (Tr. 24-25.)  He also noted Dr. Diehl's opinion that Rogers "would not be able to function satisfactorily . . . when interacting with supervisors," and the similar opinion of Dr. Reyes, but gave these opinions "little weight" (Tr. 25), and that decision has been found to be without reversible error.  The ALJ referred to Dr. Coley's opinion that Rogers "would not be able to interact appropriately with supervisors" (Tr. 26), and the ALJ's decision to afford that opinion "little weight" has also been upheld.  Hence, the ALJ both considered the evidence in this regard, and determined that his RFC finding would accommodate that limitation to the extent that it was supported by the record.

### 2. Rogers's Upper Extremity Complaints

Rogers next complains that the ALJ's RFC determination fails to mention his right shoulder "limitations."  (Pl.'s Br. at 35, ECF No. 17 at 39.)  Yet, Rogers has failed to establish that he has right shoulder limitations for which the ALJ should have found restrictions.  The ALJ noted that, in the months following his motorcycle accident, Rogers sought care for his left shoulder.  (Tr. 15.)  In June 2005, Dr. Coley found that Rogers's separated left shoulder was healing well.  (Id.) (citing Tr. 565).  A June 15, 2005 x-ray of the shoulder showed no acute dislocation or fracture.  (See also Tr. 464.)  In September 2005, Dr. Esce, one of Rogers's treating physicians, opined that he had normal strength in his upper extremities, with no range of motion deficits, and normal dexterity and



coordination.  (Tr. 16) (citing Tr. 631).  The ALJ also noted Rogers's own statement that he could lift fifty pounds.  (Tr. 26) (citing Tr. 299).

Rogers refers to Dr. Coley's opinion that his ability to lift and carry was "less than sedentary," and that he had only a twenty percent ability to use his hands and arms.  (See Tr. 976). Yet after Rogers's visit to Dr. Coley in August 2005, where the doctor found decreased range of motion (see Tr. 564), there is no mention of Rogers's shoulder.  In fact, at Rogers's last visit with Dr. Coley, three months before the doctor offered the opinion at issue, he found that Rogers had normal muscle strength and tone.  (See Tr. 944.)  It is a claimant's burden to establish his limitations, and Rogers has failed to show that the ALJ erred in not including right upper extremity restrictions in his RFC determination.  See 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) ("In general, you are responsible for providing the evidence we will use to make a finding about your [RFC]."); id. §§ 404.1512(c), 416.912(c) (requiring the claimant to provide evidence showing how his impairment affects his functioning).

## RECOMMENDATION

For the foregoing reasons, the court finds that Rogers has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through application of an incorrect legal standard.  See Craig, 76 F.3d at 589; see also 42 U.S.C. § 405(g); Coffman, 829 F.2d at 517. The court therefore recommends that the Commissioner's decision be affirmed.

Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

November 6, 2013
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).